**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES MUHAMMAD, | ) | CASE NO. 1:13-CV-00283 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | | |

Plaintiff, Charles Muhammad ("Plaintiff"), challenges the final decision of

Defendant, Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner"),[1] denying his application for a Period of Disability ("POD") and

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C.

§§ 416(i), 423 ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This

case is before the undersigned United States Magistrate Judge pursuant to the consent

of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set

forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On October 23, 2007, Plaintiff filed his application for Social Security Disability

benefits, alleging a disability onset date of June 1, 2002, and a date last insured ("DLI")

of December 31, 2004.  (Transcript ("Tr.") 19.)  The application was denied initially and

upon reconsideration, and Plaintiff requested a hearing before an administrative law

---

[1]    On February 14, 2013, Carolyn W. Colvin became Acting Commissioner
of Social Security.  She is automatically substituted as the defendant in
this case pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

judge ("ALJ").  (*Id.*)  On June 1, 2010, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff

participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A medical

expert ("ME") and a vocational expert ("VE") also participated and testified.  (*Id.*)  On

June 13, 2011, the ALJ found Plaintiff not disabled.  (Tr. 16.)  On December 14, 2012,

the Appeals Council declined to review the ALJ's decision, making the ALJ's decision

the Commissioner's final decision.  (Tr. 1.)  On February 8, 2013, Plaintiff filed his

complaint challenging the Commissioner's final decision.  (Doc. No. 1.)  The parties

have completed briefing in this case.  (Doc. Nos. 14 and 16.)

Plaintiff asserts the following assignments of error: (1) the ALJ erred by giving

weight to the testimony of the medical expert; (2) the ALJ erred in finding that Plaintiff

could engage in a significant number of jobs; (3) the ALJ erred by not providing a

duration for sitting and standing when stating his RFC assessment to the vocational

expert, and; (4) the ALJ erred by not properly considering the factors contained in 20

C.F.R. § 404.1529(c)(3) when evaluating Plaintiff's pain symptoms.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Plaintiff was born on August 1, 1954, and was 47-years-old on his alleged

disability onset date.  (Tr. 32.)  He graduated from high school in 1972 and from a

police academy in 1989.  (Tr. 33.)  He is able to communicate in English.  (Tr. 32.)

Plaintiff had past relevant work as a police officer and a security guard at a grocery

store.  (Tr. 31.)

2

## B.    Relevant Medical Evidence[2]

On November 19, 1995, while working as a police officer for the City of

Cleveland, Plaintiff was injured on the job.  (Tr. 191.)  He sustained a laceration to the

right palm, a strain in the left posterior thigh area, and onset of low back pain with

radiation down the left leg.  (Tr. 186.)  He went to the emergency room, where he had

his left hand stitched and received treatment for low back pain and left leg pains.  (Tr.

191.)  Plaintiff followed up with his primary caregiver, Dr. Daniel Leizman, an orthopedic

surgeon.  (*Id.*)  Dr. Leizman first evaluated Plaintiff on November 24, 1995.  (Tr. 186.)

Plaintiff's history at that time revealed chronic low back pain prior to his 1995 work-

related injury with multiple injuries in the past dating back to 1984, 1990, 1991, 1992,

and 1993.  (*Id.*)  An evaluation by Dr. Leizman in November 1999 showed negative

straight leg raising, tenderness along the paraspinals, lumbar spondylosis at L4-5 and

L5-S1, and lumbar spondylitic disc protrusion at L5-S1.  (Tr. 189.)

On May 11, 2000, Steven Sanford, M.D., performed an Independent Medical

Examination in connection with a workers' compensation claim arising out of Plaintiff's

November 1995 injury.  (Tr. 186-190.)  Dr. Sanford noted a lumbar MRI of April 22,

1999, which showed L4-L5 disc desiccation and posterior and lateral annular bulging

and bilateral facet arthrosis with retrodiscal compromise, but with no neural

impingement.  (Tr. 189.)  After performing a physical examination of Plaintiff and

evaluating his medical records, Dr. Sanford concluded that, regarding Plaintiff's lumbar

---

[2]    Since the ALJ was limited to a determination of whether Plaintiff was
disabled from June 1, 2002, the alleged onset date, through December
31, 2004, Plaintiff's DLI, the following discussion of Plaintiff's medical
history is confined mainly to that period.

3

sprain, Plaintiff was "clearly" at maximum medical improvement ("MMI"),[3] as "lumbar

sprains typically resolve over a period of a few days to up to five to eight weeks."  (*Id.*)

Dr. Sanford also opined that Plaintiff reached MMI with regard to his L4-L5 herniated

disc.  (*Id.*)  Dr. Sanford concluded that, based strictly on the allowed conditions in his

claim, Plaintiff would be able to return to his police patrolman work with some functional

limitations.  (Tr. 190.)  Dr. Sanford noted that "[Plaintiff's] current limitations would more

be related to non claim related conditions including advancing degenerative disc

disease at L5-S1 with facet arthritis and likely a lot of his chronic back pain is based on

facet arthrosis. . . ."  (*Id.*)

On December 11, 2001, Plaintiff saw Dr. Leizman for a follow-up regarding his

1995 work-related accident.  (Tr. 162.)  Plaintiff continued to have low back pain with

extension into the lower limbs, with pain greater on the right side compared to the left.

(*Id.*)  He was using cyclobenzaprine and Darvocet-N 100 and remained "disabled from

work."  (*Id.*)  A physical exam showed that lumbar spine range of motion was

moderately to severely decreased, the low back was tender at the L4-L5 levels, sciatic

notch were mildly tender bilaterally, and straight leg raise was positive on the right and

mildly positive on the left.  (*Id.*)  Dr. Leizman estimated that Plaintiff would be disabled

until March 2002.  (*Id.*)  He noted that Plaintiff may participate in Vocational

Rehabilitation for sedentary to light duty job retraining and placement if available.  (*Id.*)

---

[3]  "Maximum medical improvement" in the context of workers compensation
occurs when an injured employee reaches a point where his condition
cannot be improved any further.

4

Dr. Leizman requested that Plaintiff participate in physical therapy.  (*Id.*)

An evaluation from July 11, 2003, indicated that Plaintiff was not at risk of falling, he had no difficulty performing or completing routine daily activities, and he did not have concerns about his personal safety.  (Tr. 293.)  A physical examination from October 23, 2003, showed chronic low back pain, status post lumbar disc herniation, and status post lumbar spine sprain.  (Tr. 257.)  Plaintiff indicated that he was benefitting from physical therapy and Mobic medication.  (*Id.*)  On November 20, 2003, Plaintiff reported low back pain with some occasional extension into the legs, right greater than left.  (Tr. 160.)  He reported to be benefitting from physical therapy.  (*Id.*)  A physical exam showed the following: lumbar spine motion was moderately decreased with pain and guarding; low back was tender at the upper lumbar paraspinal muscles and at the lumbosacral junction; and straight leg raises were negative.  (*Id.*)

An MRI from February 9, 2004, demonstrated lumbar disc herniation L4-5 and lumbar disc herniation L5-S1.  (Tr. 264.)  On February 12, 2004, a physical exam showed the following: lumbar spine motion was moderately decreased with pain and guarding; low back was tender at the lumbosacral junction; and straight leg raises were positive on the left and negative on the right.  (Tr. 159.)  Plaintiff reported lower back pain with some extension into the left leg.  (*Id.*)  He noted that he felt he was benefitting from physical therapy.  (*Id.*)  In March of 2004, Plaintiff continued to have low back pain with some extension into the legs.  (Tr. 254.)  A physical exam showed lumbar spine motion to be moderately decreased with pain and guarding.  (*Id.*)  Plaintiff's low back was tender at the L4-5 levels and related paraspinal muscles, sciatic notches were non-

5

tender, and straight leg raises were positive bilaterally.  (*Id.*)

On April 16, 2004, Marilyn Siegal, a physical therapist for the Beachwood Work Conditioning Center, conducted a functional capacity evaluation at the request of Dr. Leizman.  (Tr. 150-153.)  Ms. Siegal reported that overall test findings, in combination with clinical observations, suggested some minor inconsistency in the reliability or accuracy of Plaintiff's subjective reports of pain and his limitations.  (Tr. 150.)  Ms. Siegal clarified that she was not suggesting an intent by Plaintiff to overstate his pain or limitations; rather, she believed that Plaintiff could do more at times than he stated or perceived and that his subjective reports should be considered within the context of the functional capacity evaluation.  (*Id.*)  The functional capacity evaluation showed the following limitations: lifting from floor to waist was limited to a light physical demand level (low end) on an occasional basis; lifting from waist to shoulder was limited to a medium physical demand level on an occasional basis; pushing and pulling were limited to a light physical demand level on an occasional basis; Plaintiff demonstrated poor tolerance to prolonged sitting with occasional breaks; single left static balance was poor (5-10 seconds) when tested with eyes closed; and manual dexterity was good.  (Tr. 151.)  Plaintiff's longest duration of sitting was 32 minutes, his longest duration of dynamic standing was 52 minutes, and his longest duration of walking was 29 minutes. (Tr. 152.)  He was able to lift 28 pounds from floor to waist on an occasional basis (low end of light work tolerance), lift 33 pounds from waist to shoulder on an occasional basis (medium work tolerance), push with an initial force of 20 pounds and a sustained force of 18 pounds for 50 feet (light work tolerance), and pull with an initial force of 20 pounds and a sustained force of 18 pounds for a distance of 50 feet.  (*Id.*)

6

On April 26, 2004, Plaintiff continued to have some low back pain but reported benefitting from his medication, home TNS unit usage, and physical therapy.  (Tr. 253.) A physical exam showed that the lumbar spine was moderately decreased with pain and guarding, and the low back was tender at the L4-5 levels.  (*Id.*)  Plaintiff's straight leg raises were negative.  (*Id.*)  The examining physician's impression included chronic low back pain with extension into both lower limbs, status post lumbar disc herniation L4-5, and status post lumbar spine sprain.  (*Id.*)

Plaintiff underwent a physical exam on August 24, 2004.  (Tr. 147.)  Lumbar spine motion was moderately decreased with guarding, the low back was minimally tender at the lower lumbar paraspinal muscles bilaterally, sciatic notches were non-tender, and straight leg raises were negative.  (*Id.*)  The physician's impression included chronic low back pain with extension into both lower limbs; status post lumbar disc herniation L4-5, and status post lumbar spine sprain.  (*Id.*)

**C.  Hearing Testimony**

**1.  Plaintiff's Hearing Testimony**

At his hearing on June 1, 2010, Plaintiff testified as follows:

Plaintiff graduated from high school in 1972 and from a police academy in 1989. (Tr. 43, 44.)  He retired from the police department in 2003.  (Tr. 44.)  Plaintiff had surgery in 1995 and went back to work after the surgery; however, the pain in his back eventually become so bad that he had to retire.  (Tr. 45.)  Plaintiff experiences lower back pain and pain running down both legs and arms.  (*Id.*)  For the past five or six years, Plaintiff has experienced shocks of pain and incidences of his legs giving out

7

when climbing up stairs.  (*Id.*)  Plaintiff can lift a gallon of milk but not a 20-pound bag of

potatoes.  (Tr. 46.)  He walks with a limp and can walk about 20 to 25 minutes at a time.

(*Id.*)  He has problems sitting and can sit for about 25 to 30 minutes before having to

stand up.  (Tr. 47.)  If he stoops or kneels, he needs to pull up on something in order to

bring himself back up.  (*Id.*)  He has pain when he bends forward at the waist.  (*Id.*)  He

is able to leave his house whenever he wants.  (*Id.*)

### 2.     Medical Expert's Hearing Testimony

Dr. Malcolm A. Brahms, an orthopedic surgeon, testified as a medical expert at

Plaintiff's hearing.  (Tr. 47.)  He testified that he reviewed Plaintiff's record and that,

based on the record, Plaintiff should be limited to no more than light work.  (Tr. 48, 50.)

The ME explained that although the record shows that Plaintiff had an MRI in March

2001, the record contains no formal report of the MRI.  (Tr. 52.)  He further testified that

without a radiologist report, the treating doctor's report noting a herniation "means

nothing."  (Tr. 53.)  The ME also addressed Plaintiff's February 2004 MRI.  (Tr. 55-56,

254, 264.)  He testified that the results of the MRI, as read to him by Plaintiff's counsel,

showed that Plaintiff's impairment "may produce symptomatology intermittently."  (Tr.

56.)  Furthermore, in determining that Plaintiff was capable of light work, the ME

considered the April 16, 2004, functional capacity evaluation, which concluded that

Plaintiff could do more than he stated or perceived, but nonetheless identified

limitations.  (Tr. 56-57, 150-153.)

### 3.     Vocational Expert's Hearing Testimony

Dr. Robert A. Mosley, a licensed professional counselor, certified rehabilitation

8

counselor, and certified life care planner, testified as a vocational expert at Plaintiff's hearing.  (Tr. 59.)  The ALJ asked him to assume, for purposes of all hypotheticals, an individual born in 1954, who graduated from high school and a police academy, and had past relevant work as a police officer and a security guard at a grocery store.  (Tr. 62.)  The ALJ then posed the following hypothetical to the VE:

> [T]his person can lift and carry up to no more than 20 pounds occasionally, 10 pounds frequently, can walk up to no more than 30 minutes at a time without a break, can stand up to no more than 30 minutes at a time without a break – when I say without a break I mean from the specific activity I'm talking about[,] not working – can sit up to no more than 30 minutes at a time without a break from sitting.  Hypothetical person must be able to go from sitting to either standing or walking and from standing or walking to sitting at least once every 30 minutes.  Hypothetical person cannot climb ladders, ropes, or scaffolds at all, can climb steps and ramps up to and no more than occasionally, can bend, stoop, crouch, squat, kneel and crawl up to and no more than occasionally.

(Tr. 62-63.)  The VE opined that the individual described could not do his past relevant work as a police officer or security guard, because of the sitting, standing, and walking limitations.  (Tr. 65.)  He further testified that there are some jobs at the light level that will allow for a sit/stand option.  (*Id.*)  The VE clarified that such jobs would be

9

considered mixed sedentary[4] and light[5] rather than just straight sedentary jobs.  (*Id.*)

He opined that the hypothetical individual could work as a cashier II (unskilled,

sedentary/light work; 10,000 employed regionally and 1.2 million nationally);

surveillance system monitor (unskilled, sedentary work; 600 employed regionally and

85,000 nationally); assembler positions (unskilled, sedentary work; 1,700 employed

regionally and 280,000 nationally).  (Tr. 68-69.)  The VE based his opinion on data he

obtained from the U.S. Department of Labor and labor market publications such as

occupation employment surveys.  (Tr. 69.)

The ALJ asked the VE for a breakdown between light and sedentary as to

cashier II jobs available in the national economy.  (Tr. 71.)  The VE testified that the

breakdown is about 50/50.  (Tr. 72.)  The VE further opined that the hypothetical

---

[4]     "Sedentary" work is defined as follows in 20 C.F.R. § 404.1567(a):

Sedentary work involves lifting no more than 10 pounds at a time and
occasionally lifting or carrying articles like docket files, ledgers, and small
tools. Although a sedentary job is defined as one which involves sitting, a
certain amount of walking and standing is often necessary in carrying out job
duties.  Jobs are sedentary if walking and standing are required occasionally
and other sedentary criteria are met.

[5]     "Light" work is defined as follows in 20 C.F.R. § 404.1567(b):

Light work involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds.  Even though the
weight lifted may be very little, a job is in this category when it requires a
good deal of walking or standing, or when it involves sitting most of the time
with some pushing and pulling of arm or leg controls.  To be considered
capable of performing a full or wide range of light work, you must have the
ability to do substantially all of these activities.  If someone can do light work,
we determine that he or she can also do sedentary work, unless there are
additional limiting factors such as loss of fine dexterity or inability to sit for
long periods of time.

10

individual could work in a cashier II position even if the individual required a sit/stand option allowing him to move freely or get up and change position.  (*Id.*)  According to the VE, some cashier II positions such as those in a cafeteria or gas station have benches where the worker can sit or stand while still performing his job duties.  (*Id.*)  The VE explained, however, that if the individual's walking or moving around would cause him to be off task, that would eliminate all jobs previously mentioned that require the individual to sit or stand and perform his job duties.  (Tr. 73.)

### III.  STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when he establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that

11

"significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   Plaintiff first met the insured status requirements of the Act on April 1, 1997, and continued to meet those requirements through, but not after, December 31, 2004.

2.   Plaintiff did not engage in substantial gainful activity or in a trial work period from June 1, 2002, the alleged onset date, through June 13, 2011, the date of this decision.

3.   From June 1, 2002, the alleged onset date, through the date of this decision, Plaintiff had and has the following severe impairments: degenerative disc disease, sprain, and strain of the lumbar spine, status post lumbar spine surgery done in 1995 or 1996; hypertension. From June 1, 2002, the alleged onset date, through September 24, 2003, Plaintiff had the following severe impairment: bilateral indirect hernias, status post bilateral laparoscopic inguinal hernia herniorrhaphy done on September 7, 2001, with insertion of approximately 19 curled metallic coils five inches in diameter.  From March 1, 2009, through the date of this decision, Plaintiff had and

has the following severe impairment: nodular prostate with obstruction, status post biopsy of the prostate done on May 4, 2009. For some period of time, Plaintiff had and/or has the following impairments, none of which were or are "severe" impairments: tear of the posterior horn of the medical meniscus of the right knee, with generalized crepitation of the knee; dorsal pain, swelling, and mild crepitation of the left wrist; tenderness and spasm in the cervical spine; degenerative joint disease of the hips.

4.    From June 1, 2002, the alleged onset date, through December 31, 2004, Plaintiff's DLI, Plaintiff did not have an impairment or combination of impairments that "met" or "medically equaled" the criteria for any of the Listed Impairments in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    From June 1, 2002, the alleged onset date, through December 31, 2004, Plaintiff's DLI, Plaintiff had the residual functional capacity to perform work activities except for the following limits on his ability to work:

      a.    Plaintiff could lift and carry up to and no more than 20 pounds occasionally and 10 pounds frequently.

      b.    Plaintiff could sit up to and no more than 30 minutes at a time without taking a break from sitting.  This does not necessarily mean that he had to take a break from working while thus taking a break from sitting.

      c.    Plaintiff could walk up to and no more than 30 minutes at a time without taking a break from walking.  This does not necessarily mean that he had to take a break from working while thus taking a break from walking.

      d.    Plaintiff could stand up to and no more than 30 minutes at a time without taking a break from standing.  This does not necessarily mean that he had to take a break from working while thus taking a break from standing.

      e.    Plaintiff had to be able to go from sitting to either standing or walking, and from standing or walking to sitting, at least once every 30 minutes.  This does not necessarily mean that he had to take a break from working while thus changing position.

      f.    Plaintiff could bend, stoop, crouch, squat, kneel, and crawl up to and no more than occasionally.

      g.    Plaintiff could climb steps and ramps up to and no more than occasionally.

      h.    Plaintiff could not climb ladders, ropes, or scaffolds.

6.    From June 1, 2002, the alleged onset date, through the date of this

decision, Plaintiff was unable to perform any of his past relevant work.

. . . . .

8. Plaintiff was born on August 1, 1954.  At all times from June 1, 2002, the alleged onset date, through July 30, 2004, Plaintiff was and is a younger individual age 45-49; at all times from July 31, 2004, through July 30, 2009, Plaintiff was and is an individual closely approaching advanced age; and at all times on and after July 31, 2009, Plaintiff was and is an individual of advanced age.

9. Plaintiff has at least a high school education and is able to communicate in English.  His education did not provide for direct entry into skilled work that he could do consistent with the residual functional capacity stated above.

10. Plaintiff acquired no job skills that are transferable to jobs that he could do consistent with the residual functional capacity stated above.

11. From June 1, 2002, the alleged onset date, through December 31, 2004, Plaintiff's DLI, considering Plaintiff's age, education, work experience, and residual functional capacity, there were and are jobs that existed and exist in significant numbers in the regional and national economy that he could and can perform.

12. Plaintiff was not under a disability, as defined in the Act, from June 1, 2002, the alleged onset date, through December 31, 2004, his date last insured.  Therefore, as a matter or law, it is irrelevant whether, from January 1, 2005, through the date of this decision, Plaintiff was or was not disabled.

(Tr. 21-35.)

## V. LAW & ANALYSIS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of*

14

*Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.      Plaintiff's Assignments of Error**

**1.      Whether the ALJ Erred by Giving Weight to the Testimony of the ME.**

Plaintiff argues that the ALJ improperly relied on the testimony of Dr. Brahms, the medical expert who testified at Plaintiff's hearing.  According to Plaintiff, Dr. Brahms' opinion was entitled to no weight, because he failed to review the medical records for the relevant time period of June 1, 2002, Plaintiff's alleged onset date, through December 31, 2004, Plaintiff's date last insured.  The Commissioner responds that Plaintiff's argument is unsupported and unfounded, because Dr. Brahms discussed

the relevant clinical findings from Plaintiff's insured period.

Plaintiff has failed to convince this Court that the ALJ erred by giving weight to Dr. Brahms' testimony.  In his brief, one-paragraph argument concerning the ALJ's reliance on Dr. Brahms' opinion, Plaintiff cites no legal authority that shows Dr. Brahms' opinion is invalid, and no legal authority that shows remand would be appropriate if it were.  *See* Plaintiff's Brief ('Pl.'s Br.") at 9.  Moreover, Plaintiff fails to explain how the ALJ's reliance on Dr. Brahms' testimony has caused Plaintiff any harm.  In fact, the ALJ relied on Dr. Brahms' opinion to find that Plaintiff has certain severe impairments.  For instance, the ALJ relied on Dr. Brahms' testimony to support a finding that from Plaintiff's alleged onset date through the date of the ALJ's decision, Plaintiff had and has the following severe impairments: degenerative disc disease, sprain, and strain of the lumbar spine, status post lumbar spine surgery done in 1995 or 1996; and hypertension.  (Tr. 22.)  Again relying on Dr. Brahms' testimony, the ALJ found that from the alleged onset date through September 24, 2003, Plaintiff had the following severe impairment: bilateral indirect hernias, status post bilateral laparoscopic inguinal hernia herniorrhaphy done on September 7, 2001, with insertion of approximately 19 curled metallic coils 5 millimeters in diameter.  (Tr. 22-23.)

Additionally, Plaintiff's argument assumes that the ALJ relied solely on Dr. Brahms' opinion in determining Plaintiff's residual functional capacity ("RFC").  This is not the case.  The ALJ provided a detailed explanation of his RFC finding, discussing not just Dr. Brahms' testimony, but also Dr. Leizman's opinions, Ms. Siegal's opinions,[6]

---

[6]    With respect to Ms. Siegal's April 2004 functional capacity evaluation, the ALJ noted the following:

and Plaintiff's own allegations of pain.  (Tr. 28-30.)  In fact, the ALJ noted in his decision that "[t]o the extent this residual functional capacity includes limitations greater than and/or in addition to those recommended by Dr. Brahms, that is because I gave greater weight to Ms. Siegal's observations and opinions, and to Mr. Muhammad's testimony, than Dr. Brahms did."  (Tr. 31.)  Clearly, then, the ALJ did not base his finding regarding disability on Dr. Brahms' testimony alone.  Thus, even assuming that Dr. Brahms based his opinion largely on records from outside of the relevant period,[7] Plaintiff does not explain how the ALJ's consideration of Dr. Brahms' testimony – in conjunction with other relevant evidence in the record – has harmed Plaintiff's interests. Accordingly, Plaintiff's first assignment of error presents no basis for remand.

### 2. Whether the ALJ Erred in Finding that Plaintiff Could Engage in a Significant Number of Jobs.

---

I gave weight to Ms. Siegal's observations and opinions to the extent that they persuaded me that Mr. Muhammad's residual functional capacity need not include any restrictions greater than or in addition to those stated in the residual functional capacity stated above. . . .  I did so because her observations and opinions were consistent with the weight of the evidence, and because they were based on testing of Mr. Muhammad that she did in 2004, after the alleged onset date (June 1, 2002) and before Mr. Muhammad's DLI (December 31, 2004).

(Tr. 30.)

[7]  The transcript from Plaintiff's hearing indicates that, at the very least, Dr. Brahms specifically addressed Plaintiff's MRI from February 9, 2004.  (Tr. 55-56, 254, 264.)  In fact, Plaintiff's counsel read the results of the MRI to Dr. Brahms, who explained that such results "may produce some symptomatology intermittently."  (Tr. 56.)  Exactly which other records from the relevant period Dr. Brahms considered is less than clear from the transcript of proceedings, nor did Plaintiff's counsel develop such evidence at the hearing.

17

Plaintiff argues that the ALJ erred in finding that Plaintiff could engage in a significant number of jobs.  At Plaintiff's hearing, the VE testified that based on Plaintiff's RFC, he could perform sedentary unskilled and light unskilled work.  (Tr. 67-68.)  The VE further testified that cashier II was the only job at the light exertional level that Plaintiff could perform.  (Tr. 69.)  According to Plaintiff, one occupation is insufficient to support a finding that a significant number of jobs exist in the national economy which Plaintiff can perform.  Furthermore, Plaintiff takes issue with the VE's testimony that the need to alternate between sitting and standing does not pose a problem for sedentary and light jobs at the unskilled level.  (Tr. 66.)  Plaintiff challenges the VE's credibility, arguing that, under the Social Security rulings, where a change in position cannot be accommodated by scheduled breaks, "the occupational base for a full range of unskilled sedentary work will be eroded."  SSR 96-9p.

Plaintiff's argument that the ALJ erred in finding that he could engage in a significant number of jobs is not well taken.  At the fifth and final step of an ALJ's analysis, the ALJ must determine whether, in light of the claimant's residual functional capacity, age, education, and past work experience, the claimant can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  At this step, the burden shifts to the Commissioner to prove the  existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs.  *Workman* v. Comm'r of Soc. Sec., 105 F. App'x

18

794, 799 (6th Cir. 2004) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  Substantial evidence may be produced through reliance on the testimony of a VE in response to a hypothetical question, but only if the question accurately portrays the claimant's individual physical and mental impairments. *Workman*, 105 F. App'x at 799 (quoting *Varley*, 820 F.2d at 779).

Here, the VE testified that a person with Plaintiff's personal and vocational characteristics, and physical and mental limitations as set forth in the ALJ's hypothetical, could perform work as a cashier II at a mixed sedentary and light exertional level, for which there are approximately 10,000 jobs in northeast Ohio and 1.2 million jobs in the national economy.[8]  (Tr. 68.)  Plaintiff contends that only one occupation cannot constitute a significant number of jobs.  Contrary to Plaintiff's argument, however, the regulations provide that "[w]ork exists in the national economy when there is a significant number of jobs (*in one or more occupations*) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."  20 C.F.R. § 404.1566 (emphasis added).  Thus, it is not the number of occupations that matters, but rather the number of available *jobs*.  There is no "special number" which is to be the boundary between a "significant number" and an insignificant number of jobs. *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988).  There is no question that 1.2 million cashier II jobs nationally and 10,000 regionally constitute a significant number of jobs, despite the fact that these jobs fall within one occupation.  *See Martin v. Comm'r of Soc.*

---

[8]    The VE also testified that at the sedentary unskilled level, Plaintiff could perform such jobs as a surveillance system monitor (600 jobs regionally, 85,000 jobs nationally) and assembler positions (1,700 jobs regionally, 280,000 jobs nationally).  (Tr. 68-69)

*Sec.*, 170 F. App'x 369, 375 (6th Cir. 2006) (finding that 870 jobs can constitute a

significant number in a geographic region); *Bishop v. Shalala*, 64 F.3d 662 (Table), No.

94-5375, 1995 WL 490126, at *2-3 (6th Cir. Aug. 15, 1995) (finding that 6,100 jobs

nationally constituted a significant number of jobs); *Lewis v. Sec'y of Health & Human

Servs.*, No. 94-1807, 1995 WL 124320, at *1 (6th Cir. Mar. 22, 1995) (finding that

14,000 jobs nationally constituted a significant number of jobs); *Girt v. Astrue*, No. 5:09-

cv-1218, 2010 WL 908663, at *4 (N.D. Ohio Mar. 12, 2010) (finding that 600 jobs

state-wide and 35,000 jobs nationally constituted a significant number of jobs).

Plaintiff's argument that the VE's testimony was not credible is also without merit.

To support his argument, Plaintiff references Social Security Ruling 83-12, which states

that "most jobs have ongoing work processes which demand that a worker be in a

certain place or posture for at least a certain length of time to accomplish a certain task.

Unskilled types of jobs are particularly structured so that a person cannot ordinarily sit or

stand at will." SSR 83-12.  Plaintiff argues that, based on this ruling, the VE's testimony

is not credible, because the VE testified that a sit/stand option would *not* be a problem

for sedentary and light unskilled jobs.  (Tr. 66.)  Plaintiff, however, fails to cite the part of

SSR 83-12 that states that in cases of unusual limitation of ability to sit or stand, a

vocational expert should be consulted to clarify the implications for the occupational

base.  *Id.*  Here, the ALJ asked the VE to consider a hypothetical individual who could

not walk or stand for more than 30 minutes without a break and who could not sit for

more than 30 minutes without a break.  (Tr. 62.)  The ALJ clarified that when he said

"without a break," he meant a break from the specific activity (walking, standing, sitting),

not a break from working.  (*Id.*)  The VE opined that there are jobs that an individual with

such limitations could perform.  (Tr. 67.)  He testified that at the sedentary, unskilled

level, the individual could perform such jobs as a cashier II, surveillance system monitor,

and some assembler positions such as a final assembler or lens inserter.  (Tr. 67-69.)

At the light exertional level, the cashier II job would be the only job the individual could

perform.  (Tr. 69.)  The VE stated that the jobs he identified allow for the worker to sit or

stand and still perform his job duties, basing his testimony on data from the U.S.

Department of Labor and occupation employment surveys.  (*Id.*)  The VE further

explained that some cashier II positions – like those in a cafeteria or gas station – have

benches where the cashier can sit or stand while still performing his job duties.  (Tr. 72.)

While Plaintiff argues that the VE's testimony is not credible,[9] it is the ALJ who

has the responsibility of evaluating a witness's credibility.  *Rogers v. Comm'r of Soc.*

*Sec.*, 486 F.3d 234, 247 (6th Cir. 2007).  The VE testified that, although Plaintiff would

require a sit/stand option, there are jobs at a mixed sedentary and light level that

---

[9]    Plaintiff argues that the VE's testimony was not credible, because the VE
testified that the need to alternate between sitting and standing "is not a
problem for sedentary and light jobs at the unskilled nature," while the
Social Security rulings provide that unskilled jobs "are particularly
structured so that a person cannot ordinarily sit or stand at will."  (Tr. 66;
SSR 83-12.)  However, the VE explicitly acknowledged that unskilled
positions, more so than professional and managerial positions, require the
worker to remain at his work station.  (Tr. 72.)  The VE testified that "if
[Plaintiff] had to walk and move around and leave the [work station] and
be off task then it would eliminate all the jobs that I indicated that require
the person to sit or stand and perform the job duties."  (Tr. 73.)  However,
just as SSR 83-12 requires, the VE clarified the implications for the
occupational base, noting that some cashier II positions allow the worker
to move freely or get up and change position while still performing his job
duties.  (Tr. 72.)

Plaintiff could perform.  (Tr. 65.)   The ALJ explained in his decision exactly why he found this testimony to be both credible and reliable.[10]  (Tr. 34.)  Accordingly, Plaintiff's argument that the VE's testimony is not credible is without merit.

### 3.	Whether the ALJ Erred by not Providing a Duration for Sitting and Standing when Stating his RFC Assessment to the VE.

In a "Statement of the Issues" section in his Brief on the Merits, Plaintiff raises the following issue: "Whether the ALJ erred by not providing a duration for sitting and standing when stating his RFC assessment to the vocational expert."  (Pl.'s Br. at 3.)  Plaintiff does not discuss the issue any further.  As a result, to the extent Plaintiff contends the ALJ erred by not providing a duration for the sit/stand option, that argument is waived, as Plaintiff suggests the argument in only one sentence and presents no legal argument and explanation in support.  *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir.2006) ("It is well-established that 'issues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'") (quoting *McPherson v. Kelsey,* 125 F.3d 989, 995–996 (6th Cir.1997)).

### 4.	Whether the ALJ Erred when Evaluating Plaintiff's Pain

---

[10]	The ALJ found the VE's testimony to be credible, because

> it was largely consistent with the DOT and the SCO (see SSR 00-4p), because, to the extent that it was not consistent with the DOT and/or the SCO, it was based on sources of data, and on his professional knowledge and experience, that I consider to be reliable even when the information in them is not consistent with what the DOT and/or the SCO says, and because it was not contradicted.

(Tr. 34.)

22

**Symptoms.**

Plaintiff argues that the ALJ failed to give proper consideration to Plaintiff's pain symptoms.  According to Plaintiff, the ALJ offered only a "blanket boilerplate statement" in his decision indicating that he considered all of the relevant evidence pursuant to 20 C.F.R. 404.1529(c)(3).  (Pl.'s Br. at 9.)  Plaintiff's argument is not well taken, as the ALJ's discussion of Plaintiff's allegations of pain extends far beyond listing the factors from 20 C.F.R. 404.1529(c)(3).  (Tr. 28-29.)  In addition to acknowledging his compliance with the regulation, the ALJ noted some of the specific allegations and evidence he considered.  (Tr. 29.)  For example, he considered Plaintiff's "various written submittals to the Social Security Administration (including Exhibits 1E, 2E, 4E, and 6E)."  (*Id.*)

Moreover, Plaintiff fails to acknowledge the discretion that an ALJ has to weigh a claimant's complaints of pain against the medical evidence.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ, are entitled to considerable deference, and should not be discarded lightly.  *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  The ALJ's credibility determinations must be reasonable and based on evidence from the record.  *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007); *Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 313, 312 (6th Cir. 1983).  The ALJ also must provide an adequate explanation for his credibility determination.  "It is not sufficient to make a conclusory statement 'that an individual's allegations have been considered' or that 'the

allegations are (or are not) credible.'" S.S.R. 96-7p, 1996 WL 374186 at *4 (S.S.A.).

Rather, the determination "must contain specific reasons for the finding on credibility,

supported by evidence in the case record, and must be sufficiently specific to make

clear to the individual and to any subsequent reviewers the weight the adjudicator gave

to the individual's statements and the reason for that weight." *Id.*

Here, the ALJ found that "some evidence in the record undermined the credibility

of some of [Plaintiff]'s allegations," and discussed the evidence to which he referred. (Tr.

29-30.)  For example, the ALJ noted that shortly before the relevant period, Plaintiff's

treating provider, Dr. Leizman, concluded that Plaintiff "may participate in Vocational

Rehabilitation for sedentary to light duty job retraining and placement."  (Tr. 29, 162.)

The ALJ also relied on the functional capacity evaluation completed during the relevant

period.  (Tr. 30, 150-151.)  Marilyn Siegal, P.T., noted in the functional capacity

evaluation summary report that Plaintiff "can do more at times than he currently states

or perceives." (Tr. 151.)  Thus, not only did the ALJ properly evaluate Plaintiff's pain

symptoms, but he adequately explained why he did not consider some of Plaintiff's

allegations of pain to be credible due to their inconsistency with the record.  Accordingly,

Plaintiff's arguments on this point are not well taken.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: October 16, 2013

24